ARTHUR T. BRINK, Trustee, Respondent, v. KANSAS CITY, MISSOURI, Appellant, No. 40918—221 S. W. (2d) 490.

Division Two, June 13, 1949.

*David M. Proctor,* City Counselor, *John J. Cosgrove* and *Benj. M. Powers,* Associate City Counselors, for appellant.

*Donald W. Johnson, Alvin C. Trippe, Hale Houts* and *Hogsett, Trippe, Depping, Houts & James* for respondent.

ELLISON, J.—The defendant Kansas City appeals from a judgment of the circuit court of Jackson County in favor of the plaintiff-respondent Brink as trustee for a large number of realty owners in the city, for $64,077.12 and interest. The principal amount is the aggregate of sums long since severally paid by the realty owners in discharge of special assessment taxbills against their respective tracts for the construction of the first section of the Brookside sewer. Recovery of those payments is sought on the theory that the special assessment proceedings were fraudulent and void because of collusive bidding by sewer contractors at the letting and conspiracy between the contractors and the city officials.

The appellant city contends chiefly, that all of the realty owners' claims were and ▇▇▇ are barred by the five year statute of limitations, Sec. 1014, R. S. 1939, Mo. R.. S. A. In addition it asserts that: (1) the evidence of fraud was circumstantial, speculative and insufficient; (2) the trial court erred in allowing interest on the claims

from the date of payment instead of the date of demand (by bringing this suit), which point respondent concedes; (3) the suit was not in equity but in assumpsit for money had and received, by reason of which the trial court erred in denying the city a jury trial.

The respondent's chief answering contention is that since the case involves fraud it is covered by the fifth subdivision of Sec. 1014, supra, which provides that "an action for relief on the ground of fraud . . (is) deemed not to have accrued until the *discovery* by the aggrieved party, at any time within ten years, of the facts constituting the fraud." (Italics ours). Hence he maintains the five year limitation did not begin to run until the fraud was discovered—which he asserts was less than five years before this suit was brought on August 21, 1944, as to most of the 952 causes of action sued on. He further contends the fraud was concealed by the city; that a fiduciary relation existed between it and the realty owners; that the latter had no means of discovering the fraud; and that the statute of limitations was also tolled by duress (as later explained).

The special assessment proceedings in this case were begun on March 22, 1937. A construction contract was let on September 28, 1937. The sewer was completed on January 15, 1938. The special taxbills were certified and issued on February 11, 1938, and were due in 30 days, or, if not then paid in full they became payable in four equal annual·installments bearing 7% interest per annum from date of issue to maturity, and 8% interest thereafter. Nearly 6-½ years after the due date of the taxbills the instant action was instituted on August 21, 1944, as stated above, to recover payments theretofore made by the property owners on the taxbills. The third amended petition on which the cause was tried, was filed on February 10, 1947, and was amended by adding 54 new counts and defendants, on December 15, 1947. Of the 952 taxbills involved in that petition, 782 had been paid in full (as we understand) more than five years before the institution of the suit. And on 113 taxbills partial payments were made before that time. Ten counts were dismissed. Thus it appears there were 47 taxbills upon which no payments had been made before the institution of this suit, if our understanding is correct.

Respondent's legal theory that the appellant city is obligated to refund the amounts paid on the taxbills is based mainly on the first two of the three cases cited below;[1] and the city's theory of non-liability is based on the third case. The chronology of these three decisions and their holdings must be kept in mind. The first, or Ruckels, case was a class suit in equity brought on August 14, 1939,

---

[1]Ruckels v. Pryor et al., 351 Mo. 819, 829(3), 843(4), 847(6), 174 SW. (2d) 185, 188(2), 196(6), 199(8); Brink v. Kansas City, 355 Mo. 860, 865(1), 872(5, 6), 198 SW. (2d) 710, 716(5); Brink v. Kansas City, 358 Mo. 845, 217 SW. (2d) 507, 509(1-8), 511(9-10).

by a realty owner (in which 208 others later joined) to cancel the contract for the construction of the *second* section of the Brookside sewer and the special assessment taxbills therefor, on the same grounds as here—collusive bidding and fraudulent conspiracy. The decree of the trial court was reversed because of that fraud, and the taxbills were ordered cancelled by the judgment of this court on July 6, 1943.

In the second case cited[1] by respondent, hereinafter called the "first Brink case", the action was brought by the present respondent Brink on February 25, 1944, a little over seven months after the reversal of the Ruckels case by Division I of this court. It was a class action for money had and received in behalf of about 400 realty owners on the same second section of the Brookside sewer, to recover payments made on taxbills, with interest, on the ground that the taxbills were void for fraud, as held in the Ruckels case. The taxbills on that section of the sewer were not even issued until September 28, 1939, less than five years prior to the institution of this first Brink action and so there could not have been any payments on the taxbills during the intervening time, recovery ▉ of which would have been barred under the five year statute of limitations when the suit was brought.

But the city defended on the ground that the realty owners had *voluntarily* paid the taxbills, and the plaintiff Brink maintained to the contrary that they were paid under legal *duress*. Division 1 of this court upheld the latter contention on the ground that the great expense involved in litigation to cancel or defend against the taxbills, and the heavy accumulation of interest payments during its pendency, would have made the financial burden on the realty owners excessive, amounting to coercion or duress. And the decision held this was true notwithstanding the realty owners may have known of the invalidity of the taxbills.

In this connection, it should be further stated that in this first Brink case the petition of the plaintiff in the Ruckels case was introduced in evidence along with the two volume transcript of the evidence in that case. And the Ruckels decision [351 Mo. 1. c. 830, 174 SW. (2d) 1. c. 188 (2)] stated it appeared from the transcript that the instant plaintiff-respondent Brink was chairman of a property owners' committee in "the sewer district" (meaning, as we understand, the whole Brookside sewer district). The opinion also further stated that Brink wrote a letter to the property owners in the district on June 9, 1939, telling them the average tax assessment per lot of 50x130 feet would be $48.75; that the sewer was nearly completed; suggesting that each owner contribute 10% of his anticipated tax to a "litigation fund"; and adding that if the result was successful the sewer would be constructed but that they would not have to pay for it, or "in other words, you could have your cake and eat it."

The third case cited above,[1] hereinafter called "the second Brink case", was decided first in Division 2 and affirmed en banc last Feb-

ruary. It, likewise, was an action for money had and received brought by the instant plaintiff-respondent Brink to recover payments made by realty owners on taxbills for the construction of the *second* section of the Brookside sewer. The taxbills thereon were issued on September 28, 1939, and the action was filed over seven years four months later on February 7, 1947. This court held "the opinion in the Ruckels case reveals that the property owners were acquainted with all the circumstances before (their) payments were made" (parenthesis ours); that it established "the law of the case that the property owners paid the taxbills under duress"; but " did not give rise to a cause of action" on that ground. In short, the decision held a cause of action accrued to the realty owners for any payments made, though under duress, as soon as the payments were made; that the statute of limitations was not tolled by the mere fact of duress; and that as to any such payments made more than five years before the bringing of the suit the action was barred under Sec. 1014, supra.

There can be no escape from the ruling of this recent decision of the court en banc, unless it be afforded by one or the other of two considerations. The first is whether there is any material difference in the facts as between the *first* section of the Brookside sewer, involved here, and the *second* section involved in the three cases cited and discussed above. The other consideration calls for inquiry as to how full and complete the *discovery* of the fraud must be to start the running of the five year period of limitation under Sec. 1014 of our statutes, supra. Respondent's brief, written since the decision of the second Brink case, stresses that point.

There was no difference in the nature and character of the fraud practiced in the letting of the contracts for the construction of both the first and second sections of the Brookside sewer. Respondent Brink's third amended petition in this case pleaded the fraud was "continuous in operation and single in character", and both that and his original petition alleged the fraud had existed since May 1, 1932. Furthermore the trial court in the earlier Ruckels case had found in November, 1941, that for a long ▆▆▆ period of years there had been collusion between a small ring of contractors to manipulate the bidding on *all* public works, and conspiracy between them and certain city officials, so that the contract would be awarded to a favored contractor. In the instant case the trial court found the conspiracy had existed since May 1, 1932. In the Ruckels case the lower court's judgment was against Ruckels and in favor of contractor Pryor, *not* because there was a failure of proof as to the fraud, but because the court concluded the contract was duly performed for a reasonable price and profit, and that there was not enough evidence to show the other contractors named in Ruckels' petition had been parties to the conspiracy.

Finally, on the question whether the respondent Brink and the realty owners whose claims were assigned to him as trustee, had *discovered* the fraud of which they complain, before August 21, 1939— that is to say, five years before the institution of this suit on August 21, 1944—so as to bar this suit by limitation under Sec. 1014, supra. If they had not then discovered the fraud, it was their duty to plead that fact in their petition along with facts which would toll the statute, showing due diligence on their part in attempting to discover the fraud; or that it was not within their power; or that the other parties had by artifice or trick concealed the facts; or that a fiduciary relation existed between them and the other parties. Womack v. Callaway County (Mo. Div. 2) 159 SW. (2d) 630, 632 (5-6).

In his original petition in this case, paragraph 6, the respondent Brink as trustee did plead that his assignors "had no knowledge of the frauds hereinafter alleged which invalidated said taxbills, and did not discover or know of said frauds" until this court decided the Ruckels case, supra, on July 6, 1943. And in the 8th paragraph he pleaded: that the frauds were known to the city and its officers; that they were not apparent on the face of the records of the special assessment proceedings; and that no one of the realty owners *would* know, or *would* be in a position to know or discover the incriminating facts.

But respondent Brink's third amended petition filed February 10, 1947, did not repeat those allegations. It merely restated the historical and legal (so to speak) facts; listed the realty owners and tracts against which the taxbills were issued merely by *reference* to and adoption of paragraph 5 of the preceding petitions; and in the 6th to 10th paragraphs charged "wrongful and inequitable conduct, fraud, imposition, and duress on the part of the defendant city." But nowhere did these 10 paragraphs charge that the realty owners were ignorant of the fraud.

Next, paragraph 11 stated the particular amount previously paid and sought to be recovered back by the first realty owner listed in the 952 counts, and prayed judgment therefor with interest and costs. And immediately after that was the following paragraph: "12. Plaintiff hereby adopts counts 2 to 898 both inclusive as shown and set forth in plaintiff's original, first and second amended petitions filed herein and by reference hereby makes the same a part of this their amended petition to the same extent and as fully as though each count was attached hereto and set out in full."

And next there was a long prayer for the *whole* third amended petition. This, in connection with the 9th and 10th paragraphs thereof, attempted to convert the original action at law for money had and received (as in the first and second Brink cases) into an action in equity on the theory that it would avoid a multiplicity of suits, and that the taxbills (which had already been paid) constituted a cloud

on the titles of the several realty owners to their respective tracts of land. This prayer sought an adjudication that the special assessment proceedings and taxbills were void, and a money judgment in favor of respondent Brink for all moneys paid by his several assignors on the taxbills, and for interest and costs.

Counsel for respondent Brink argue here that the catch-all paragraph 12 in the third amended petition kept alive and drew into the case *all* the allegations of the original petition, including the one stating that the realty owners *did not know of the fraud* until this court decided the Ruckels case in July, 1943. And while that paragraph does broadly purport to adopt all of counts 2 to 952 of the preceding petitions, yet successive ▮▮▮▮ readings of the whole third amended petition lead us to the conclusion that such was not its purpose. Apparently, the first 10 paragraphs were intended to *restate* the general facts and to supersede the corresponding paragraphs in earlier petitions, whereas paragraph 11 descended to particulars concerning the first realty owner in the long list. And the catch-all paragraph 12 did the same thing for the other property owners.

If this view is not correct, there is nothing in the third amended petition carrying forward the allegations of the *first* count of the original petition, whereas in the first ten paragraphs of the third amended petition and in the original petition there are duplicated statements of the general facts with some conflicting allegations therein. The foregoing construction of the instant third amended petition is corroborated by the fact that it was filed on February 10, 1947, a little over two months after the rendition of our opinion in the first Brink case, supra,[1] on December 9, 1946. And that decision held the fact that the taxbills there involved were *paid with knowledge* of their invalidity did not defeat the defense of duress. [355 Mo. l. c. 872(5), 198 SW. (2d) l. c. 716(5)].

In other words, the pleader in this case must have concluded at the time that under the duress doctrine it was unnecessary to plead the realty owners were ignorant of the fraud. Furthermore, the city's answer pleading the statute of limitations for the first time (in any of these cases), was not filed until July 30, 1947, over five months after respondent's third amended petition had been filed. But the respondent Brink did not file a reply or amend his petition in that regard, doubtless because he relied on the quasi-legal theory stated in his original petition that the property owners had no knowledge of the fraud until the opinion of this court in the Ruckels case was delivered on July 6, 1943, which was only a little over thirteen months before the instant suit was filed on August 21, 1944, and therefore eliminated the five year statute of limitations.

▮▮▮ We confess the conclusion we have reached on the foregoing point is deductive. But in any event we think and further hold the

realty owners did have knowledge of the fraud of the contractors and city officials more than five years before this suit was filed on August 21, 1944—that is to say, before August 21, 1939. Those frauds were wholesale on all municipal projects and had been in continuous operation for over seven years since May 1, 1932. The restrictive bidding of contractors on various projects and the disproportionate awarding of contracts to favorite contractors were matters of record. Respondent Brink testified that he and the realty owners he organized were against the *whole* Brookside sewer project; that "there were 400 of us there almost broke down the old city hall in objecting to this thing" (date. not shown). Over 100 of them had an "indignation meeting" at the Brookside Hotel in March or April, 1939, and he said "It had been warming up for years." A Rossetter auditing firm was employed to audit the city's books and records, and worked from June 1 to November 15, 1939.

And as recited in the Ruckels case numerous realty owners had protested en masse to the Board of Public Works on April 2, 1937. Ruckels filed his first suit on May 26, 1939, in the Federal Court at Kansas City to enjoin issuance of the taxbills. Respondent Brink wrote his "have your cake and eat it" circular letter to realty owners on the second section of the sewer on June 19, 1939. At the trial of this case he testified as to the unity of the realty owners, saying: "the entire concept of the Brookside neighborhood is not of a sewer broken into two sections. It is the Brookside sewer." And finally, on August 14, 1939, over five years before this suit was instituted, Ruckels filed his case in the state court to enjoin and cancel the contract and taxbills, which was reversed by this court. One of respondent Brink's counsel here was counsel in both the Ruckels cases just referred to.

■■■■ He testified in the instant case from memory that he began looking over the public records "sometime" in 1939, but wouldn't say it was "early" that year. He further said the first Ruckels suit in the Federal court was brought on a "wrong theory" and they had no evidence to support it. And he conceded there were articles in the newspapers about it. Continuing, he said they refiled the same petition in the state court on August 14, 1939, and discovered they were "still on the wrong track." Then he stated it was not until "sometime in 1941, as I recall it" that they had the evidence which did establish "*this* conspiracy we are talking about" (italics ours). Whereupon they filed an amended petition in the Ruckels case (on March 27, 1941, as the record therein shows). And respondent's brief here vigorously contends that is the earliest possible date on which it could be contended the realty owners, in the instant case, had knowledge of the fraud.

The opinion in the Ruckels' case [351 Mo. l. c. 830-1, 174 SW. (2d) 188-9] recites his Federal suit was filed on May 26, 1939 [as

above stated] but that the contractor to whom the sewer contract had been awarded was not joined as a party defendant and the Federal court dismissed the suit for want of jurisdiction. Five days later, on August 14, Ruckels filed his case in the state court, still without joining the contractor as a party. The contractor brought mandamus in the state court on August 19, and was awarded a peremptory writ pursuant to which the taxbills were issued and delivered to him on September 28. Thereafter Ruckels amended his petition on October 28 by making the contractor a party defendant.

The Ruckels opinion further states the case was tried on a second amended petition filed March 27, 1941, but does not mention any change of theory therein. And the counsel who testified in this case below conceded the basic ground of both the Federal and state Ruckels suits from the start was "conspiracy to restrict bidding" and "monopolies contracts." However, when he made that affirmative answer to a question he qualified it by adding, "but not in this fashion." But it seems to us from the foregoing that Ruckels' difficulties in the early stages of his litigation were procedural and not substantive. Respondent did not introduce in this case the original petition in the Ruckels case, which he now says was on the wrong theory, and it is not in our court files here on that case. Neither did the respondent Brink testify he was ignorant of the fraud, nor were any of the realty owners called to make proof of the fact.

The brief for respondent Brink contends further: (1) that the city concealed the facts constituting the fraud; (2) that the realty owners had no means of discovering the fraud; (3) that the five year statute of limitations was tolled by the duress imposed on the property owners by the city; (4) and that a fiduciary relationship existed between the property owners on the one hand and the city and its officers on the other.

We think what is said in the preceding paragraphs hereof disposes of the first two of these points. This court en banc held in the second Brink case, supra [217 SW. (2d) l. c. 509 (1-8)] that the facts stated in the Ruckels opinion "reveals that the property owners were acquainted with all the circumstances before such (taxbill) payments were made." On the third point, as to duress, the same case on page 510 likewise held: "The claim that the expense of such a suit amounted to duress and therefore the statute of limitations was stayed is not sound. It was good only as against the plea of voluntary payment."

On the fourth point, that a fiduciary relation existed between the realty owners and the city and its officers, respondent Brink cites Foster v. Petree, 347 Mo. 992, 995(3), 149 SW. (2d) 851, 853(5). That decision dealt with the relations of an administrator c.t.a. and an heir of a testator. It stated the rationale of the fiduciary relation doctrine is that such a relation may result in causing a truster to relax his vigilance and be "lulled into a sense of security." But

certainly the facts in this case show the exact opposite was true here. Furthermore, there was not a fiduciary relation between the realty owners and the city and its officers. The special assessment proceedings were in invitum.

The judgment is reversed and the cause remanded to the circuit court for further proceedings not in conflict herewith. All concur.