Alan ANDERSON, et al., Plaintiffs,

v.

INDUSTRIAL ELECTRIC REELS, INC., a Nebraska Corporation, Defendant.

No. 8:CV91–00712.

United States District Court, D. Nebraska.

Feb. 10, 1993.

prove that Smith acted intentionally, recklessly, or callously (Instruction No. 7, Part II).

Robert E. O'Connor, Jr., and Terry J. Grennan, Cassem, Tierney, Adams, Gotch & Douglas, Omaha, NE, for plaintiffs.

David F. Byrnes, Littler, Mendelson, Fastiff & Tichy, San Francisco, CA, and Robert T. Cannella, Firzgerald, Schorr, Barmettler & Brennan, Omaha, NE, for defendant.

KOPF, District Judge.

Pending before the court are Plaintiffs' motion to lift the January 29, 1992, stay of this matter and to remand to state court or in the alternative to compel arbitration, (Filing 12), and Defendant's motion for summary judgment and for sanctions (Filing 17).

The court will deny Plaintiffs' motion, but will grant Defendant's motion for summary judgment because the issue underlying this litigation—whether Plaintiffs, as replaced striking employees, were in fact terminated from their employment, which might then entitle them to the benefits of the Nebraska Wage Payment and Collection Act—is a matter properly addressed only by the National Labor Relations Board (NLRB). The court will deny Defendant's motion for sanctions.

## I. FACTUAL BACKGROUND

Plaintiffs in this action are members of the International Association of Machinists and worked at Defendant's plant in Omaha, Nebraska, under a collective-bargaining agreement which expired on July 4, 1991. Plaintiffs went on strike against their employer on July 8, 1991, after failing to arrive at terms for a new collective-bargaining agreement. On July 29, Defendant replaced those striking employees who failed to return to work on July 24.

As a consequence of the failed negotiations, the union filed a complaint with the NLRB which alleged that the company's conduct during negotiations for an agreement to succeed the expiring agreement amounted to unfair labor practices contrary to Sections 8(a)(1), (3) and (5) of the National Labor Relations Act (hereafter "the Act"). Following a hearing in Omaha conducted by an administrative law judge, the judge determined, (Filing 18, Ex. 1), that, with one exception not pertinent here, Defendant had not committed any unfair labor practices and that the strike was an economic strike.[1] The judge also

---

1. In *NLRB v. MacKay Radio and Tel.,* 304 U.S. 333, 345, 58 S.Ct. 904, 910, 82 L.Ed. 1381 (1938), the Court held that an employer may replace its striking workers during an economic strike as the employer has the right to protect and continue its business by filling jobs left vacant by

found that Defendant had offered reinstatement to all but five of the striking employees, with the employer maintaining that it had no duty to make an offer to those five because they had engaged in strike misconduct.[2] (Filing 18, Ex. 1, at 31–32.) Only two of the strikers returned to work. The judge found that all of the striking employees who had been offered reinstatement, but had not accepted it, were permanently replaced. (*Id.*) The judge found that Defendant may have an obligation to place all but the five "misconduct" strikers on a preferential hiring list "if the strikers wish to return to work" because the strike was ongoing.[3] The judge found that as of July 7, 1992, the strike was continuing.[4]

## II. PROCEDURAL BACKGROUND

This action was originally filed in the District Court of Douglas County, Nebraska. The plaintiff strikers claimed they had been "terminated" from their employment and, as a result, were entitled to payment for accrued[5] vacation and personal leave time payable within a specified period of time pursuant to the Nebraska Wage Payment and Collection Act, Neb.Rev.Stat. § 48–1228 *et seq.* (Reissue 1988 and 1992 Cum.Supp.).

Defendant sought to remove the state court action to federal court since the determination of amounts of any benefits due

the plaintiff strikers was an issue governed by the collective-bargaining agreement, and under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, this court had jurisdiction. Removal was sustained by the judge then assigned to this case. (Filing 7.)

Following removal to this court, this action was stayed pending arbitration of the vacation and personal leave pay issues. (*See* Filing 7, Jan. 29, 1992). On September 3, 1992, counsel for Plaintiffs notified the court that Defendant had refused to arbitrate but had paid vacation pay due and owing Plaintiffs. (Filing 11, Attachment.) Counsel advised the court that the applicability of the Nebraska Wage Payment and Collection Act concerning attorneys' fees and penalties remained at issue. Counsel also advised the court that Plaintiffs would seek relief from the stay in order that this court might make a determination of the applicability of the Nebraska Wage Payment and Collection Act, stating that there was no controversy concerning the amounts owed for vacation pay or personal leave. (*See* Filing 12.) Defendant responded to Plaintiffs' motion to dissolve the stay by filing its own motion for summary judgment and for sanctions (Filing 17).

Defendant argues that Plaintiffs' action pursuant to the Nebraska Wage Payment and Collection Act is pre-empted by the Act and, as a consequence, neither this court

---

strikers. But if the economic strikers wish to return to work, the employer must not punish the strikers for the exercise of their right to strike by refusing them work, if work is available. *Id.* at 346, 58 S.Ct. at 911.

**2.** The judge stated the parties stipulated that the company had evidence which would support "the belief" that those employees had engaged in picket line misconduct. Picket line misconduct may disqualify a worker from the protection of the Act. The standard for determining picket line misconduct is "whether the misconduct is such that, under the circumstances, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act," which includes the right not to strike. *See Clear Pine Mouldings,* 268 NLRB 1044, 1046 (1983). The administrative law judge did not determine that the five strikers committed picket line misconduct. Thus, on the state of this record, these persons remain "employees" of

Defendant under the Act for reasons articulated in more detail in Part III(A) of this opinion.

**3.** *MacKay Radio* also made it clear that the employer does not have an obligation to discharge replacement workers upon the election of the economic strikers to resume their employment. See *MacKay Radio,* 304 U.S. at 345–46, 58 S.Ct. at 910–11. But, as noted previously, if an economic striker wishes to return to work, the employer must not discriminate against the striker because the employee exercised the right to strike. *Id.* at 346.

**4.** The union did not file a charge with the NLRB that the striking plaintiffs were "terminated." Nor did the union file a charge claiming the strikers were unlawfully denied benefits.

**5.** The word "accrued" apparently means benefits earned under the collective-bargaining agreement but not used.

nor any state court has subject matter jurisdiction. Defendant argues that the heart of this dispute is whether Plaintiffs have been "terminated" from their employment. And, Defendant specifically argues that the question—whether or not an employee who has engaged in a strike and has been replaced has been "terminated"—is a matter for determination by the NLRB and not for a state or federal court. Plaintiffs argue that their claim does not derive from federal labor law, and that the state law claim is independent of any collective-bargaining agreement and federal labor law. Thus, Plaintiffs argue, the matter is not pre-empted.

## III. DISCUSSION

### A. Motion for Summary Judgment

█ Summary judgment should be granted "only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. Summary judgment is an extreme and treacherous device which should not be granted unless the moving party has established a right to a judgment with such clarity as to leave no room for controversy, and unless the other party is not entitled to recover under any discernible circumstance. *Vette Co. v. Aetna Casualty & Sur.*, 612 F.2d 1076, 1077 (8th Cir.1980). In ruling on a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Id.* Even if the district court is convinced that the moving party is entitled to judgment, the exercise of sound judicial discretion may dictate that the motion be denied, in order that the case can be fully developed at trial. *McLain v. Meier*, 612 F.2d 349, 356 (8th Cir.1979).

█ The test to be applied when considering summary judgment is "whether the evidence presents a sufficient disagree-

ment to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Under Federal Rule of Civil Procedure 56 due deference must be given to the rights of litigants to have their claims adjudicated by the appropriate finder of fact; however, equal deference must be given under Rule 56 to the rights of those defending against such claims to have a just, speedy, and inexpensive determination of the action where the claims have no factual basis. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

The parties have not suggested any dispute of fact which would prohibit the granting of summary judgment. Accordingly, the court will turn to the merits of the motion.[6]

#### 1.

█ The court has concluded that it does not have jurisdiction to rule on the merits of this case. As a consequence, summary judgment is appropriate. The court reached this conclusion because the NLRB has exclusive jurisdiction over whether Plaintiffs have been "terminated." *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959) ("When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."). It is impossible to determine the applicability of the Nebraska Wage Payment and Collection Act without knowing whether Plaintiffs were "terminated." In order to determine whether the employees were "terminated" for state law purposes, a court would have to answer various questions which are properly within the purview of the NLRB.

---

**6.** Since the court resolves the motion for summary judgment in favor of Defendant, finding that the action is pre-empted, the motion for

remand or to compel arbitration must be denied.

Therefore this court, as well as any state court, lacks jurisdiction.

### 2.

Paragraph 6 of the affidavit of the business representative of the International Association of Machinists sets forth Plaintiffs' legal claim: "After expiration [of the Collective Bargaining Agreement on July 4, 1991] the plaintiffs were *terminated* by [defendant] and were not paid their vacation pay or personal leave pay." (Filing 13, ¶ 6) (emphasis added). The factual basis for this claim of "termination" was the "replacement" of the striking employees: "It seems to me that if you have permanently replaced the employees, a result of the economic strike, as you claim, then my people should be entitled to immediate pay of their vacation pay." (Filing 19, Ex. A (Letter from Plaintiffs' Counsel to Defendant's Counsel of 08/26/91).)

By March 3, 1992, Plaintiffs acknowledged that all of the striking employees had received the benefits due them. (*See* Filing 18, Ex. 6.) Defendant represents that these payments were made on November. 26, 1991. (Mem.P. & A.Supp.Def.'s Resp.Mot. Dissolve Stay and Remand; Supp.Def.'s Mot.Summ.J. and Sanctions at 3 n. 2 & 6–7.)[7] However, the strikers indicated through counsel that they would continue to pursue the present litigation because the amounts were not paid within the time provided by Nebraska law. (Filing 18, Ex. 6.)

The Nebraska Wage Payment and Collection Act, Neb.Rev.Stat. §§ 48–1228 to 1232 (Reissue 1988 and 1992 Cum.Supp.), and specifically § 48–1231, provides that an employee having a claim for wages, including fringe benefits, may institute suit for collection if the amounts owed are not paid within specified periods of time. The Nebraska law also provides for payment of attorney fees, (Neb.Rev.Stat. § 48–1231),

and a penalty of up to twice the amount owed, (Neb.Rev.Stat. § 48–1232), if a plaintiff prevails.

Since Defendant voluntarily paid the disputed benefits to Plaintiffs, this lawsuit is really a claim for attorney fees and penalties because of "late" payment. In this regard, Neb.Rev.Stat. § 48–1230 establishes the time when payment must be made to "terminated" employees: "Whenever an employer ... separates an employee from the payroll, the unpaid wages shall become due on the next regular payday or within two weeks of the date of termination, whichever is sooner."

### 3.(a)

The court turns first to the issue of whether any court could adjudicate this case without implicating § 8 of the Act. In order for a state or federal court to apply the Nebraska wage collection law, there would have to be a determination of whether the striking plaintiffs were "terminated" by Defendant when they were replaced.[8] The answer to this question would almost certainly implicate § 8 of the Act, and, in so doing, a state or federal court would contravene the Court's holding in *Garmon.*

■ With exceptions not important here, under federal law an employee remains an employee while striking. Section 2(3) of the Act provides in pertinent part that an "employee" includes "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice." 29 U.S.C. § 152(3). *See NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 381, 88 S.Ct. 543, 547, 19 L.Ed.2d 614 (1967) (The "status of the striker as an employee continues until he has obtained 'other regular and substantially equivalent employment.'") (citation omitted).[9]

---

**7.** Defendant made these payments voluntarily. (Mem.P. & A.Supp.Def.'s Resp.Mot. Dissolve Stay and Remand; Supp.Def.'s Mot.Summ.J. and Sanctions at 3 n. 2.)

**8.** According to Plaintiffs' counsel, it was the act of replacement which entitled Plaintiffs to their accrued benefits. (Filing 18, Ex. A (Letter from

Plaintiffs' Counsel to Defendant's Counsel of 08/26/91).)

**9.** This concept is of more than mere technical significance to a striker since his or her right to reinstatement turns on this principle.

Furthermore, pursuant to §§ 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) & (3), an employer may not coerce an employee to refrain from striking or discriminate against an employee for striking. Indeed, in *MacKay Radio*, 304 U.S. at 346, 58 S.Ct. at 911, the Court made it clear that: "As we have said, the strikers retained, under the Act, the status of employees. Any ... discrimination in putting them back to work is, therefore, prohibited by § 8." The Court specifically held, however, that a striking employee may be permanently replaced. *Id.* at 345–46, 58 S.Ct. at 910–11.

If, in applying state law, a court were to agree with Plaintiffs and determine that their "employee" status was in fact "terminated" because, as Plaintiffs contend, they were permanently replaced, such a finding would be contrary to the Act. It would be squarely in conflict with § 2(3) of the Act which provides that strikers remain employees, and would frustrate the express holding of *MacKay Radio* regarding § 8 of the Act that employers may permanently replace economic strikers so long as they do not discriminate against those employees. Stated differently, federal labor law permits replacement of strikers, but the strikers remain employees. A contrary result based upon state law would clearly contravene national labor policy.[10]

Still further, the Supreme Court held some 25 years ago that the denial to striking employees of a benefit provided by an expired collective-bargaining agreement, such as vacation pay, violated § 8(a)(3) of the Act if the reason for the nonpayment was anti-union in purpose and other re-placement workers were accorded benefits denied the striking employees. *NLRB v. Great Dane Trailers*, 388 U.S. 26, 32–35, 87 S.Ct. 1792, 1796–98, 18 L.Ed.2d 1027 (1967).[11] However, it is for the NLRB to determine whether such discrimination took place. *Id.* There are situations where the NLRB has held that such accrued benefits are not required to be paid under the Act. *See, e.g., Johns–Manville Sales Corp.*, 289 NLRB 358, 364–65 (1988). Thus, if there is no discrimination or coercion, unless the collective-bargaining agreement would require payment of the accrued benefits, there is no federal labor law which would require the employer to pay such accrued benefits because the workers were replaced.[12]

The following is evident: On the one hand, if there is no discrimination or coercion, *MacKay Radio* explicitly allows striking employees to be replaced, but the Act considers the replaced strikers to still be continuing employees. A contrary holding by a state or federal court in applying state law would contravene § 8 of the Act, and *Garmon* thus applies. On the other hand, if there is discrimination or coercion against replaced strikers, § 8 of the Act is clearly implicated, the NLRB has jurisdiction under *Great Dane Trailers*, and *Garmon* again applies. In any and all events, striking workers remain employees under the Act, and are not "terminated" because they are replaced.

### 3.(b)

The court turns next to the alternative request to compel arbitration. It is important to distinguish between accrued bene-

---

**10.** As a practical matter, such a holding would have a measurable impact upon the progress of a strike by shifting monies from the employer to the strikers. It might also have serious implications for a striker who later claimed a right to reinstatement.

**11.** A violation of the "anti-coercion" provisions of § 8(a)(1) of the Act could also be involved. In any event, under either § 8(a)(1) or § 8(a)(3) the test is the same, and a prima facie violation is established where there is proof that: (1) the benefit was accrued, and (2) the benefit was withheld on the apparent basis of the strike. *Texaco, Inc.*, 285 NLRB 241, 245 & n. 20 (1987).

**12.** It might also be argued that pre-emption applies in this case under the related, but different, doctrine (*"Machinists"* pre-emption) that protects against state interference with policies implicated by the structure of the Act regarding conduct that Congress intended to be unregulated. *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 409 n. 8, 108 S.Ct. 1877, 1883 n. 8, 100 L.Ed.2d 410 (1988) (comparing *Garmon* pre-emption with the type of pre-emption discussed in *Metro. Life Ins. v. Massachusetts*, 471 U.S. 724, 749, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728 (1985), and *Machinists v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976)). The court does not reach this question.

fits—such as vacation pay which derives (if at all) from the collective-bargaining agreement itself—and a claim regarding attorney fees and penalties for late payment of benefits—which derives from state law.

If accrued benefits (as opposed to attorney fees and penalties) under the collective-bargaining agreement were still at issue, a lawsuit founded upon Nebraska law to compel payment would be pre-empted by § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a).[13] *See Lingle v. Norge Div. of Magic Chef,* 486 U.S. at 403–06, 108 S.Ct. at 1879–81 (If the resolution of a state law claim depends upon the meaning of a collective-bargaining agreement, the application of state law is pre-empted). In this circumstance, for the reasons stated earlier, *Garmon* principles would have prohibited the conclusion under the Nebraska wage collection law that the striking employees were "terminated" by replacement. Thus, the only remaining question would be whether the striking employees had a right under the collective-bargaining agreement (without reference to the Nebraska wage collection law) to accrued benefits upon demand. Indeed, this was the apparent basis for Chief Judge Strom's [14] earlier ruling sustaining removal and staying the matter so that Plaintiffs could exhaust the arbitration provisions of the agreement. (Filing 7.)

■ Despite the fact that the agreement "expired," since Plaintiffs claimed their right to payment of benefits was vested in the "expired" collective-bargaining agreement, (Filing 1, Attached "Pet."; Filing 12, Mot.Remand), the dispute as to benefits had to be arbitrated pursuant to the arbitration provisions of the agreement. *Litton Fin. Printing v. NLRB,* — U.S. —, —, 111 S.Ct. 2215, 2225, 115 L.Ed.2d 177 (1991) (A post-expiration grievance predicated upon "an action … [which] infringes a right that accrued or vested under the agreement" is, assuming an arbitration provision in the expired agreement, subject to the presumption that the dispute is arbitrable under the precepts of *Nolde Bros., Inc. v. Bakery Workers,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977)).[15]

On the other hand, once the benefits were paid in this case (outside of arbitration) and accepted by Plaintiffs, there was nothing to arbitrate because penalties and attorney fees derive not from the collective-bargaining agreement but from the Nebraska wage collection law.[16] Therefore, with nothing left to arbitrate, it makes no sense to compel arbitration.

### 4.

Boiled down to its essence, Plaintiffs' argument amounts to this: Even though federal law explicitly permits an employer to replace striking employees, the State of Nebraska may require employers to pay attorney fees and penalties for "late" payment of accrued vacation pay by determining that for state law purposes the striking employees have been "terminated" by replacement during a strike. If adopted, this

---

**13.** Simply stated, this section provides that the federal courts have jurisdiction over suits involving claimed violations of a collective-bargaining agreement.

**14.** This case was originally assigned to the Honorable Lyle E. Strom, Chief United States District Judge, but it was reassigned to me when I became a United States District Judge.

**15.** There was a dispute not only about whether Defendant was obligated to pay anything, but also about what amount of benefits was owed. Suit was filed in state court on November 8, 1991. While believing it had no legal obligation to pay anything, Defendant made a voluntary payment of benefits on November 26, 1991. This case was removed to federal court on December 5, 1991, and a motion for stay was filed that same date. Chief Judge Strom ordered the stay on January 29, 1992. (Filing 7.) It was not until March 3, 1992, that Plaintiffs' counsel agreed to the amount paid by Defendant. (Filing 18, Ex. 6.) Thus, it was not disingenuous of Defendant to seek a stay pending arbitration since Plaintiffs had not accepted the amount of the voluntary payment at that time.

**16.** This is the primary position taken by Plaintiffs in their brief requesting remand to state court: "The right to an amount of vacation pay is no longer at issue—assuming it ever was an issue. Therefore, … the remaining issue is one over which there is no federal jurisdiction inasmuch as there is no pre-emption [under *Lingle,* 486 U.S. at 403–06, 108 S.Ct. at 1879–82]." (Pls.' Br.Supp.Mot. Dissolution of Stay and Remand to Douglas County Ct. or in the alternative to Compel Arbitration at 9.)

argument would mean that state law could impose substantial costs upon an employer in a labor dispute for doing what federal labor law permits—the replacement of strikers.[17] This is exactly the conflict between federal and state law which the *Garmon* pre-emption doctrine is designed to prevent:

> The obligation to pay compensation can be, indeed is to be, a potent method of governing conduct and controlling policy. Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme.... It may be that an award of damages in a particular situation will not, in fact, conflict with the active assertion of federal authority.... To sanction [such conduct] involves a conflict with federal policy in that it involves allowing two law-making sources to govern.

*Garmon*, 359 U.S. at 247, 79 S.Ct. at 780–81.

■ The court therefore finds and concludes that: (a) as a matter of federal law, Plaintiffs were not "terminated" by Defendant's action in replacing the plaintiffs who were economic strikers; (b) federal law does not require payments of accrued benefits to replaced striking employees unless: (i) the failure to pay is discriminatory or coercive under the Act, or (ii) the payments were required under the expired collective-bargaining agreement; (c) if there is a dispute about whether the failure to timely pay the benefits was discriminatory or coercive, that issue is for the NLRB to determine, but that issue has not been put to the NLRB; (d) the question of whether Defendant was obligated to make payments of accrued benefits under the expired collective-bargaining agreement was governed by federal law and was the proper subject of arbitration, but once the amounts claimed due were paid by Defendant (outside of arbitration) and accepted by Plaintiffs, there was no longer any open issue for arbitration under the collective-bargain-

ing agreement as the attorney fee and penalty claims arise out of state law and not the collective-bargaining agreement; and (e) an award of a penalty and attorney fees by a court applying Nebraska law would violate the Court's holding in *Garmon* because such a ruling would, pursuant to state law, impose substantial costs upon an employer in a labor dispute for doing what federal labor law permits—the hiring of workers to replace striking employees.

### 5.

Plaintiffs present a variety of arguments as to why *Garmon* pre-emption does not apply. Only two merit discussion.

First, Plaintiffs contend that the Nebraska wage collection law establishes minimum standards touching "deeply rooted" state interests and is similar to unemployment compensation, citing *New York Tel. v. New York Dep't of Labor*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (in enacting the National Labor Relations Act and the Social Security Act, Congress did not intend to pre-empt a state's power to pay unemployment compensation to strikers, even though such payments may have a measurable impact upon the progress of a strike). Whatever the meaning of *New York Tel.*, it is not applicable here.

The New York statute dealt with the payment of public funds, albeit it partly raised from employers, to strikers. *Id.* at 533–34, 99 S.Ct. at 1337–38. This was critical to the Court's conclusion: "[S]uch unemployment benefits are not a form of direct compensation paid to strikers by their employer; they are disbursed from public funds to effectuate a public purpose." *Id.* at 534, 99 S.Ct. at 1338 (citations omitted). In this case, the benefits sought are "direct compensation paid to strikers by their employer." Therefore, the rationale of *New York Tel.* is not applicable.

Moreover, in *New York Tel.*, the Court made clear that "there is no claim in this case that New York has sought to regulate or prohibit any conduct subject to the regu-

---

**17.** It might also seriously complicate a striker's right to reinstatement.

latory jurisdiction of the Labor Board under § 8." *Id.* at 529, 99 S.Ct. at 1335 (footnote omitted). In contrast, this case turns on the very definition of "employee" for § 8 purposes and whether a state may impose substantial costs upon an employer when replacing an economic striker. This factor also renders *New York Tel.* inapplicable to this case.

Second, Plaintiffs argue that the opinion of the Kansas Supreme Court in *Whelan's, Inc. v. Kan. Dep't of Human Resources,* 235 Kan. 425, 681 P.2d 621 (Kan.1984), compels the conclusion that *Garmon* preemption is not applicable here. While *Whelan's* has a number of similarities to this case, this court will not follow the Kansas Supreme Court.

In *Whelan's,* the striking employees brought their dispute regarding vacation pay to the NLRB as an unfair labor charge under the Act. The NLRB took jurisdiction. The employer then chose to settle the matter and agreed to pay the striking workers the same vacation pay which had been paid to non-striking workers, which was a reduced wage rate. The union objected to payment at the reduced rate, and the NLRB considered and rejected the objection. The union did not appeal. Whelan's complied with the approved settlement, and the NLRB closed its file. Contending that the amount of the wage was merely peripheral and unrelated to the Act, employees sought relief under Kansas law to obtain pay at the rate which existed prior to the strike. With the Chief Justice of the Kansas Supreme Court dissenting on the basis of *Garmon* and similar cases, the Kansas Supreme Court held that the amount of the wage was not protected under the Act and there was no pre-emption.

For the reasons expressed earlier in this opinion and for the reasons expressed by Chief Justice Schroeder, 681 P.2d at 627–630, this court respectfully concludes that *Whelan's* was incorrectly decided. But, more importantly, despite certain similarities, *Whelan's* is not applicable to the facts of this case.

In *Whelan's,* the Kansas Supreme Court was able to sidestep fears of interfering with national labor policy because the striking employees had first gone to the NLRB to determine whether they were entitled to vacation pay in any amount. In this case, the employees have not invoked the jurisdiction of the NLRB, and, in fact, Defendant voluntarily made the payments. This means that if Plaintiffs' position is adopted, the court would necessarily determine in the first instance whether Defendant was obligated to make payment in any amount. In other words, in order to determine whether attorney fees and penalties are applicable, the court would first have to determine whether the strikers had been "terminated" by the replacements. The application of *Whelan's* in this case therefore poses a much greater likelihood that national labor policy would be frustrated as contemplated by *Garmon.*

**B. Defendant's Motion for Sanctions**

Federal Rule of Civil Procedure 11 requires in pertinent part:

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by ... one attorney of record.... The signature of an attorney ... constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

As part of its motion for summary judgment, Defendant seeks sanctions, (Filing 17, at 3–4), predicated upon Plaintiffs' motion to dissolve stay and for remand (Filing 12). The basis of Defendant's request for sanctions is the claim that Plaintiffs' lawyers should have known when they filed their motion that they could not prevail on the merits of the motion because of the doctrine of pre-emption.

■ The court does not believe sanctions should be imposed in this case. The court finds that the challenged motion was "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law," given *Whelan's*. Once they accepted as accurate Defendant's voluntary payments in the spring of 1992, Plaintiffs' counsel could reasonably argue that the only remaining issues were similar to those found not subject to pre-emption in *Whelan's*. Indeed, this was stated in the allegedly offending motion: "[T]he only issue at controversy concerns whether or not the defendant is subject to the penalty provisions of [the Nebraska wage collection law].... There is no controversy concerning the amounts owed for vacation pay or personal leave." (Filing 12.)

Even though the court has found that *Whelan's* is not applicable to the facts of this case, the Kansas precedent is sufficiently close to the facts of this case that sanctions "might discourage and 'chill' vigorous and ingenious advocacy, especially in matters of controversial character where there is a reasonable likelihood of achieving potential change in the law." *Aetna Casualty & Sur. v. Fernandez*, 830 F.2d 952, 956 (8th Cir.1987). Accordingly, the request for sanctions will be denied.[18]

IT IS ORDERED that:

(1) Plaintiffs' motion for relief from the stay and for remand or, in the alternative, to compel arbitration, (Filing 12), is denied;

(2) Defendant's motion for summary judgment and for sanctions, (Filing 17), is granted in part and denied in part as follows:

    a. The motion for summary judgment is granted, with the court finding that the NLRB has exclusive jurisdiction over this matter;[19]

    b. The motion for sanctions is denied.

---

18. Furthermore, to the extent Defendant complains that Plaintiffs' counsel failed to inform the court at the time of the motion that Plaintiffs were economic strikers, this fact was disclosed to the court by Defendant's counsel prior to Plaintiffs' motion. (Defs.' Br.Supp. (1) Removal, and (2) Mot.Stay at 12.) Thus, the court was not misled by the allegedly offending motion. In addition, Defendant also seeks sanctions pursuant to 28 U.S.C. § 1927. For the reasons stated in the text and in this footnote, the request for sanctions under § 1927 will be denied.

19. This ruling is without prejudice to the filing of a charge with the NLRB that Plaintiffs have been wrongly "terminated" or unlawfully denied benefits.